1  MARC J. WINTHROP – State Bar No. 63218
mwinthrop@winthropcouchot.com
2  GARRICK A. HOLLANDER – State Bar No. 166316
ghollander@winthropcouchot.com
3  JEANNIE KIM – State Bar No. 270713
jkim@winthropcouchot.com
4  **WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
5  660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
6  Telephone: (949) 720-4100
Facsimile: (949) 720-4111
7
8
[Proposed] General Insolvency Counsel for
9  Debtor and Debtor-in-Possession

10  **UNITED STATES BANKRUPTCY COURT**

11  **CENTRAL DISTRICT OF CALIFORNIA**

12  **LOS ANGELES DIVISION**

13

14  In re:

15  PRIME CHOICE FOODS, INC., a Virginia
corporation,
16

17                Debtor and
18                Debtor-in-Possession.

| | |
|---|---|
| Case No. 2:14-bk-13422 RK | |

Chapter 11 Proceeding

**DECLARATION OF JOSÉ G. GOMEZ IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS RE:**

**(1)  CASH COLLATERAL;**
**(2)  PAYROLL;**
**(3)  UTILITIES; AND**
**(4)  LIMIT NOTICE**

DATE:       [TBD]
TIME:       [TBD]
PLACE:      Courtroom 1675
             Edward R. Roybal Federal Building
             & Courthouse
             255 E. Temple Street
             Los Angeles, CA 90012

19
20
21
22
23
24
25
26
27
28

1    I, José G. Gomez, declare and state as follows:

2    1.    I am the President and chief executive officer ("CEO") of Prime Choice Foods,

3  Inc., a Virginia corporation, the debtor and debtor-in-possession in the above-captioned case

4  ("Debtor"), and am authorized to make this Declaration on behalf of the Debtor, in support of

5  Debtor's "first-day" motions regarding: (1) Cash Collateral; (2) Payroll; (3) Utilities; and (4)

6  Limit Notice ("Motions"). I have personal knowledge of the facts set forth herein, and, if called

7  upon to testify, could and would competently and truthfully do so.

8    2.    In my capacity as the Debtor's CEO, I manage the Debtor's day-to-day operations.

9  My responsibilities include managing operations at the corporate headquarters and supervising the

10  preparation and maintenance of the Debtors' corporate books and records. These records are

11  maintained on regular basis, in a consistent and business-like manner, by a competent staff. This

12  staff collects all necessary data for each Debtor and then records and preserves this data in the

13  corporate records in a manner that is accurate and consistent with industry practice.

14    3.    Based upon my personal knowledge of the Debtor, its business operations and its

15  books and records, and based upon information contained in the Debtor's books and records and

16  assembled under my supervision and direction, I am qualified to give this declaration on behalf of

17  the Debtor.

18    4.    Except as otherwise indicated below, all of the facts set forth in this declaration are

19  based upon my personal knowledge, my review of relevant documents and reports prepared for

20  me by officers and employees of the Debtor, or outside consultants employed by the Debtor,

21  discussions I have had with officers and employees of the Debtor and outside consultants or my

22  opinion based upon my experience, expertise and knowledge of the Debtor's operations, financial

23  condition and industry. I were called upon as a witness, I could and would testify competently as

24  to my knowledge regarding the veracity of the facts set forth herein.

25  **Background of the Debtor.**

26    5.    The Debtor is a leading manufacturer and wholesale distributor of natural, organic,

27  wholesome grain, and kosher snack foods. The Debtor offers a wide variety of snack items on a

28  co-packing and private label basis. The Debtor's customers include national brands such as Late

July and Beanitos, the fastest growing brands in natural and organic chips.  The Debtor's products are also sold under the private labels of chain grocers such as Maijer, Ocean, and Poppy. Founded in 2000, the Debtor has grown to become a leader in manufacturing organic snacks, due primarily to the company's organic and kosher certifications and high quality of product.  Gomez Family Enterprises, Inc.[1] owns 100% of the interests in the Debtor.

6.      The Debtor currently has approximately forty (40) employees, most of whom the Debtor employs in its manufacturing plant located in Bristol, Virginia.  The Debtor's headquarters is located in Los Angeles, California.  The Debtor generated gross sales of $8,273,244, $7,951,554 and $8,859,143 for the fiscal years ended September 30, 2013, September 30, 2012, and September 30, 2011, respectively.

**Events Leading to the Chapter 11 Filing.**

7.      The Debtor experienced continued significant growth from its inception through 2007, reaching a peak of $11 million in sales.  Between 2010 and 2013, however, the Debtor lost two of its largest customers, resulting in a material decrease in revenues.  The reduction in revenue between 2011 and 2013 resulted in significant losses and cash flow challenges for the Debtor.  In response, the Debtor took a variety of steps to return to profitability by stabilizing its sales and reducing expenses.  Between 2012 and 2013, the Debtor reduced raw material acquisition costs, direct labor expenses, and indirect overhead, resulting in almost a doubling of gross profit and positive Earnings Before Interest Taxes Depreciation and Amortization (EBITDA) of $640,000.  The management team continues to eliminate costs, specifically in the area of direct labor, indirect overhead, warehousing and distribution.  General and administrative expenses will be further reduced due mainly to the fact that the management has taken substantial pay cuts.

8.      The financial difficulties caused the Debtor to default on its loan agreements with Capital Bank, N.A. (the "Bank").  Despite the Debtor's good faith attempts to negotiate with the Bank, the Debtor has not been able to reach a consensual agreement with the Bank concerning

---

[1] Gomez Family Enterprises, Inc. is owned by Jose G. Gomez (10%) and Jose G. Gomez and Marina Gomez jointly (90%).

restructuring of its loans.  On January 8, 2014, the Bank sent a notice of default advising that the Bank intended to pursue its remedies if the loan was not repaid by January 21, 2014.  The inability of the Debtor to obtain alternative financing or restructure with the Bank and the threat of collection and foreclosure have left the Debtor with no other choice but to commence this chapter 11 case to preserve the Debtor's value as an operating business and maximize value for its creditors.

9.    The Debtor commenced the above-captioned case by filing a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on February 25, 2014 (the "Petition Date").

**Secured Claims[2]**

**The Bank's Claims and Its Collateral.**

10.    Pursuant to three (3) promissory notes, one dated June 3, 2004, another one dated July 27, 2006, another one dated October 25, 2010, and yet another one dated November 4, 2010, as each may have been amended from time to time, and all other documents, instruments and agreements, including, without limitation, guaranty agreements, deeds of trust, security agreements, UCC-1 Financing Statements and UCC-2 Notice of Filings, evidencing, securing and/or relating to the loans, by and between the Debtor and the Bank, the Bank advanced to the Debtor $5,977,154.  According to the Bank, the Debtor has made principal payments, which have reduced the Debtor's indebtedness to approximately $4.6 million.  The Bank asserts a security interest in substantially all of the Debtor's assets.

**The Internal Revenue Service's Claims.**

11.    I am informed and believe thereon that, on or about September 17, 2012, the Internal Revenue Service of the United States of America ("IRS") recorded tax liens against the Debtor in the amount of $173,810.  I am further informed and believe thereon that, on or about October 23, 2012, the IRS recorded a second tax lien against the Debtor in the amount of $59,022.

---

[2] The Debtor has not completed analyzing the validity, perfection, avoidability, amount, extent, or priority of the Bank's claims or liens.

**The State of Virginia Taxing Authority's Claims.**

12.    I am informed and believe thereon that, on or about August 29, 2012, the state of Virginia Taxing Authority ("Virginia") recorded state tax liens against the Debtor in the amount of $24,932.

**Non-Consensual Liens.[3]**

13.    Certain judgment creditors that prevailed over the Debtor in various state court or small claims matters pre-petition have recorded non-consensual liens against the Debtor. Specifically, I am informed and believe thereon that, on or about January 12, 2011, Packing Services recorded a judgment lien against the Debtor, in Tennessee, on account of a small claims judgment in Packing Services' favor in the amount of $16,288.  I am further informed and believe thereon that, on or about May 21, 2012, Waste Connections of Colorado, Inc. recorded a judgment lien against the Debtor, in Colorado, on account of a civil judgment issued by the Denver District Court in the amount of $9,218.  I am also informed and believe thereon that, similarly, on or about July 6, 2012, Jefferds Corporation ("Jefferds") recorded a lien against the Debtor, in California, on account of a civil judgment in Jeffords' favor in the amount of $6,559.

**The Debtor's Cash Collateral Proposal.**

14.    The Debtor proposes to use funds that may be asserted to be cash collateral in connection with the continued operation of the Debtor's business, in accordance with the provisions of the Debtor's budget attached as Exhibit "1" ("Budget") hereto and incorporated herein by this reference.  The Debtor proposes to use any cash collateral of secured creditors holding liens against cash collateral ("Cash Collateral"), as cash collateral is defined under the Bankruptcy Code (collectively, the "Secured Creditors") pursuant to the following terms and conditions:

        a.    Budget.

        The Debtor may pay the ordinary and necessary operating expenses provided for in the Budget that the Debtor actually incurs and that relate to services or materials provided

---

[3] The Debtor has not completed analyzing the validity, perfection, avoidability, amount, extent, or priority of the judgment liens recorded by the parties described here.

1    to the Debtor after the Petition Date, and if necessary, to exceed the amounts set forth in

2    the Budget by as much as 15% of the total budgeted expenses.  Any expenditures in excess

3    of this authorization will require the written approval of each respective Secured Creditor,

4    or further order of the Court after appropriate notice.  Budget savings in any week or

5    month may be carried over and used by the Debtor in subsequent weeks or months,

6    respectively (*i.e.*, to account for changes in the timing of expenditures by the Debtor).

7          b.    Term of Budget.

8          The Debtor may use Cash Collateral during the period commencing upon entry of

9    the order authorizing the Debtor's use of Cash Collateral and terminating on the first to

10    occur of the following:  (i) the date of the final hearing on the motion regarding the

11    Debtor's use of cash collateral ("Cash Collateral Motion"); or (ii) the date of the

12    occurrence of an Event of Default (defined below), unless such Event of Default is cured.

13          c.    Limitation on Authorization.

14          Notwithstanding any other relief sought herein, during the Operating Period, the

15    Debtor shall not be authorized to use any Cash Collateral:  (a) from the sale or disposition

16    of assets outside of the ordinary course of business of the Debtor; or (b) to pay any

17    obligation owed to any party (other than to the Secured Creditors) on account of or

18    relating to services and/or product provided prior to the Petition Date, including, without

19    limitation, obligations relating to the provision or sale of goods, materials or services, or

20    obligations on account of purchase orders, that were provided by the Debtor prior to the

21    Petition Date.

22          d.    Procedure for Use of Cash Collateral.

23          The Debtor shall deposit all Cash Collateral and post-petition fund deposits now or

24    hereafter in the Debtor's possession in its debtor-in-possession accounts that it maintains

25    (the "DIP Accounts"), subject to the Secured Creditors' liens, if any, and the Debtor shall

26    disburse funds only from the DIP Accounts.  The DIP Accounts will not contain any

27    overdraft protection and no Automated Clearinghouse Transactions will be allowed.  Any

28    authorization to use the Cash Collateral in the Debtor's DIP Accounts shall be expressly

limited by the terms of the Order approving the Cash Collateral Motion.  Within seven (7) days of receipt therein, the Debtor will provide to the Bank copies of any and all bank statements and cancelled checks related to the DIP Accounts, as well as all deposits for such deposit account showing all receipts and disbursements by the Debtor.

> e.    <u>Replacement Liens, Priority and Perfection</u>.

As and for adequate protection of the Debtor's use of any cash collateral of the Secured Creditors, the Debtor will grant to each of the Secured Creditors replacement liens ("Replacement Liens") encumbering the Debtor's pre-petition and post-petition assets, including the Debtor's accounts, inventory, and equipment, in which and to the extent that the Debtor holds an interest, whether tangible or intangible, whether by contract or operation of law, excluding avoidance causes of action, and including all rents, issues, profits and proceeds of the foregoing, to the same extent and priority as any duly perfected and unavoidable liens in cash collateral held by the respective Secured Creditors as of the Petition Date, limited to the amount of any such cash collateral of the respective Secured Creditors as of the Petition Date, to the extent that any cash collateral of the respective Secured Creditors is actually used by the Debtor.

The Replacement Liens shall enjoy the same validity, perfection, and superiority to any other security or collateral interest, mortgage, lien or claim in or to the collateral securing the respective claims, as the pre-petition liens and security interests of the Secured Creditors, without taking any further action, notwithstanding any otherwise applicable requirements under state law.

The Order granting the Cash Collateral Motion shall be sufficient and conclusive evidence of the granting, attachment, validity, perfection and priority of the Replacement Lien, without the necessity of filing or recording any financial statement or other instrument or document, or taking any other act which might otherwise be required under state or federal law, rule, or regulation of any jurisdiction to validate or perfect the Replacement Lien, including, without limitation, deposit account control agreements, merchant payment agreements, merchant payment direction letters, and such other

MAINDOCS-#196900-v2-PrimeChoice_GomezDecReFirstDayMtns

agreements, with any party possessing or asserting an interest in protected assets (a "Perfection Act"), provided, however, that the Replacement Lien shall only have the same validity, perfection, and priority as the pre-petition lien.  Notwithstanding the foregoing, if a Secured Creditor, in its sole discretion, elects to effectuate a Perfection Act, the Secured Creditor shall be authorized to perform such act, and if requested by the Secured Creditor, the Debtor shall be authorized to perform and shall execute and deliver such act to the extent necessary or required, and in such event, the subject filing or recording office or agency is authorized to accept, file, and/or record any document in regard to such act in accordance with applicable law.  No defect or failure in connection with an attempt to perform a Perfection Act shall limit, waive, or alter the validity, enforceability, attachment, or perfection of the Replacement Lien.

> f.    <u>Reservation of Rights</u>.

The Debtor, any Official Committee of Unsecured Creditors, and all other parties-in-interest each reserve any and all rights that they may have to object to the claims of creditors asserting secured claims against the estate and to object to the validity, priority and extent of such claimants' asserted liens, if any, encumbering the Debtor's assets for 60 days from the entry of the Final Order approving the Debtor's use of Cash Collateral. Without limiting the generality of the foregoing, the Debtor reserves the right to object to the extent of any liens that the creditors may assert in the Debtor's assets as of the Petition Date.

> g.    <u>Financial Reporting</u>.

The Debtor will provide to the creditors asserting secured claims against the estate: (a) a report for each month (the "Monthly Report"), a report comparing actual collections and expenses (by expense category) to those set forth in the Budget for that month; (b) a report listing the Debtor's aging of receivables; (c) a report listing the Debtor's unaudited balance information, income and profit and loss; (d) all documents and information submitted to or requested by the United States Trustee; and (e) all documents filed by the Debtor with the Court.

The Monthly Report shall include an accounting of the Cash Collateral from the period of the first (1st) through the final day of each month (except for the expenditures made during the first month in which the Debtor is authorized to use Cash Collateral, in which case, that Monthly Report shall cover the period from the Petition Date through the end of that calendar month), no later than fifteen (15) days after the end of each calendar month, in a format sufficient to permit the Secured Creditors to track all income and expenditures in each budget category on an actual basis, as required under Section 363(c)(4).

h.    Ordinary Course of Business.

Except as otherwise permitted by Court order or as authorized by the Secured Creditors, the Debtor shall conduct its business operations in the ordinary course and on ordinary and customary terms consistent with the terms and manner by the Debtor prior to the Petition Date.

i.    No Offsets.

Except as authorized by the Secured Creditors, the Debtor shall not permit any offset or return of collateral to any vendor, contracting party or any other party, unless such party is entitled to recoupment under applicable law.

j.    Termination of Cash Collateral Use.

i.    In the event that the Debtor should allegedly default in the performance of any of its obligations related to Cash Collateral as set forth in this Motion, the Secured Creditor(s) shall provide to the Debtor, the Debtor's general insolvency counsel, the official committee of unsecured creditors (if any is appointed, the "Committee"), or if there is no Committee appointed, to the Debtor's twenty largest creditors, and counsel to the Committee, if counsel is retained (collectively, the "Notice Parties"), via email and/or first-class mail, written notice of such default (the "Default Notice").  The Debtor shall have a grace period of five (5) business days after the Debtor's receipt of the Default Notice (the "Grace Period") within which to cure such default.

1    If the Debtor cures any default, the Secured Creditor(s) shall provide

2    written acknowledgment of the Debtor's cure to the Debtor and all other Notice

3    Parties.  In the event that the Debtor should fail to cure any default within the

4    Grace Period (an "Event of Default"), the Secured Creditor(s) may file with the

5    Court a declaration asserting an Event of Default (the "Declaration of Default").

6    The Debtor shall have the right to oppose any such asserted Event of Default by

7    filing a written opposition and request for a hearing thereon on shortened time

8    ("Opposition") within three (3) court days of the filing of the Declaration of

9    Default.  The Debtor shall be authorized to use the Cash Collateral of the Secured

10    Creditor(s) pending the Court's resolution of the asserted Event of Default.  The

11    Debtor's Opposition shall be limited to:  (a) whether the asserted default occurred;

12    (b) whether the asserted default is excused; or (c) whether the Debtor timely cured

13    the asserted default.  If the Debtor does not file and serve an Opposition within

14    three (3) court days from the Secured Creditor's filing and service of the

15    Declaration of Default, the Secured Creditor's consent for the Debtor's use of Cash

16    Collateral shall be revoked on the fourth (4th) court day after the Secured

17    Creditor's filing of the Declaration of Default.  If, however, the Debtor timely files

18    its Opposition, whether the Debtor is authorized to continue its use of Cash

19    Collateral will depend solely on whether the Debtor committed an Event of

20    Default, whether the default was excused, or whether the default was timely cured,

21    all of which shall be determined by the Court.  If the Court finds that the Debtor

22    did not commit an Event of Default, was excused from committing an Event of

23    Default, or timely cured an Event of Default, Debtor shall be authorized to

24    continue use of cash collateral.  If, however, the Court finds that Debtor did

25    commit an Event of Default, was not excused from committing an Event of

26    Default, and failed to timely cure an Event of Default, Debtor's use of cash

27    collateral shall be immediately revoked upon the date of the Court's entry of an

28    order to that effect.

1          For the purpose of this paragraph only, the Debtor shall be deemed to have

2     cured timely any Default pursuant to the provisions of this paragraph, if the

3     aggregate of the Debtor's actual expenditures for the month alleged to be in

4     default, and the Debtor's actual expenditures during the Grace Period, is not

5     greater than 115% of the projected expenditures for such combined period set forth

6     in the Budget.

7          ii.   Relief from Automatic Stay.  The automatic stay provisions of the

8     Bankruptcy Code and any other restriction or injunction imposed by an order of the

9     Court or by law are hereby modified and vacated without further notice,

10    application, or order of the Court to the extent necessary to permit the Secured

11    Creditor(s) to perform any act authorized or permitted under or by virtue of the

12    Cash Collateral Motion, including, without limitation, the Secured Creditor's

13    taking a Perfection Act; provided, however, that the Secured Creditor shall not be

14    entitled to enforce any right or remedy with respect to any of the collateral (other

15    than with respect to Cash Collateral as otherwise provided herein) without

16    obtaining further relief from the automatic stay.

17    k.   Final Hearing.

18          The Debtor will reserve the right to seek, at the final hearing on the Cash Collateral

19    Motion, use of Cash Collateral different from that set forth herein.

20    15.   I believe that the Budget attached as Exhibit "1" hereto confirms that if the

21    Debtor is allowed to continue operations and to use its existing cash, accounts receivable

22    and inventory in the ordinary course of its operations, it will generate positive cash flow

23    and the amounts of its cash, accounts receivable and inventory will increase, thereby

24    ensuring the preservation of the Secured Creditors' interests in Cash Collateral.  In

25    contrast, I believe that, if the Debtor is denied the use of Cash Collateral, the Debtor may

26    be unable to provide customers ongoing with product, and the value of the Secured

27    Creditor's collateral, and in fact the Debtor's entire business enterprise, may suffer

28    immediate and perhaps irreparable harm.

16.    In connection with the foregoing I further believe that the Debtor's proposal to use any Cash Collateral of the Secured Creditors provides adequate protection to the Secured Creditors.

17.    I also believe that under the Debtor's proposal to use Cash Collateral, the Secured Creditors' interests in any Cash Collateral will be adequately protected from a diminution in value through (i) replacement liens granted to the Secured Creditors; (ii) through the maintenance and preservation of the Debtor's business; and (iii) the projected stabilization of cash flow, accounts receivable and inventory during this case.  In fact, as reflected in the Budget, I anticipate that the Secured Creditors' collateral increases in value.

18.    Under the Debtor's Cash Collateral proposal, each of the Secured Creditors will be granted a post-petition replacement lien on pre-petition and post-petition assets, and the proceeds acquired and/or generated with any Cash Collateral, with a value equal to the amount of any pre-petition Cash Collateral expended by the Debtor.

19.    As indicated above, I believe that the cash flow projections attached as Exhibit "1" hereto confirm that the Debtor's cash, accounts receivable and inventory will increase in value during the initial thirteen (13) weeks of the Debtor's Bankruptcy Case.

20.    I further believe that the projections of its business operation, as set forth in the projections, are reasonable.  The business assumptions underlying the operations projected in the projections are reasonable and are essentially in accordance with the Debtor's historical experience, as adjusted to take into account recent or projected events (*e.g.*, the cuts made to the Debtor's operating expenses).  Therefore, I believe that the projections establish that the proposed replacement liens being granted to the Secured Creditors will adequately protect their alleged interests.

21.    In summary, I believe that the Budget establishes with reasonable certainty that the Debtor's use of any Cash Collateral of the Secured Creditors will result in stabilization and growth of the estate's collateral pool, thereby adequately protecting the Secured Creditors' interests in any Cash Collateral.

22.     Based on my 34 years' experience as the Debtor's President and Chief Executive Officer, I believe that even a temporary cessation of the Debtor's ability to operate its business, caused by any lack of access to any cash collateral, will result in a substantial diminution of collateral of the Secured Creditors, as customers will turn to competitors of the Debtor for their organic snack products.  In contrast, maintenance of the Debtor's ongoing operation will preserve the value of the Secured Creditors' interest in any Cash Collateral as nearly as possible against any risk to that value, thus providing adequate protection.

23.     As set forth in the Budget attached as Exhibit "1" hereto, the Debtor projects that the cash, accounts receivable and inventory balances will increase during this case in general and, specifically, during the initial thirteen (13) week period.

24.     The Debtor enjoys a good public image and is currently generating positive earnings (EBITDA) from operations.  I believe that, if the Debtor is authorized to use Cash Collateral, the value of its business enterprise will be preserved and this enterprise ultimately will provide a source of repayment for all creditors. In contrast, I believe that, if the Debtor is denied use of Cash Collateral, it may be forced to close its business and to cease operations.

25.     As previously stated, I believe that a cessation of operations, even temporarily, would cause irreparable damage to the Debtor's business in the form of customer defections, employee attrition, lost revenues and loss of goodwill.  If the Debtor were permanently prohibited from using Cash Collateral, it may be forced to close operations, and its assets then would need to be liquidated, yielding proceeds totaling a fraction of what the Debtor could generate by continuing operations and by reorganizing its financial affairs.  The Debtor does not have real property assets or other very valuable "hard" assets.  Rather, the Debtor's assets consist essentially of inventory, and used furniture, fixtures and equipment.  Accordingly, I believe that the only means for the Debtor's creditors to obtain any favorable recovery in this case is for the Debtor to remain in business and to use profits generated from operations.

26.     The Debtor must have the immediate use of any Cash Collateral to meet payroll obligations, to meet the daily costs and expenses of operating its business, to promptly pay its vendors, and to acquire goods and services to keep its business operating. I believe that any delay in the Debtor's ability to meet one or more of the aforementioned operating needs could deprive the Debtor of its ability to successfully reorganize its financial affairs.

**The Debtor's Payroll Motion.**

27.     In order to preserve and maintain the Debtor's ongoing business operations, and to meet the needs of its customers, the Debtor must retain the support of its employees. To retain this support, I believe that the Debtor must timely pay all pre-petition payroll and wage related obligations owed to this constituency.

28.     The next payroll is due and payable on February 28, 2014 for employee services rendered for the period February 10, 2014 through February 24, 2014, and thus represents pre-petition claims. To meet this obligation, payroll needs to be funded as soon as possible.

29.     I believe that employees will leave if they are not paid, which will cause immediate and irreparable damage to the Debtor's business. In contrast, I believe that, if the Court permits the Debtor to pay its employees, post-petition, on account of services rendered pre-petition, the business value will be preserved for the benefit of all creditors.

30.     The Debtor seeks Court authority to pay its pre-petition wage related obligations and honor its employee related pre-petition benefits. These obligations include pre-petition payroll, wages, salaries, federal, state and local payroll taxes, deductions and withholdings, payroll deductions relating to various benefits, reimbursement of business expenses, and miscellaneous other claims asserted by current employees (including, without limitation, worker's compensation, medical, dental, life insurance, and disability insurance) (collectively, the "Pre-Petition Compensation"). These benefits include vacation pay, sick leave, holiday pay, jury duty pay, and other paid leave ("Benefits").[4]

---

[4] As a cost-saving measure beginning January 1, 2014, the Debtor modified its policy related to paid vacation leave. Under the new policy, employees may not accrue more than two (2) weeks of paid vacation leave per calendar year. Employees were required to use, or other forfeit, all accrued paid vacation leave earned prior to January 1, 2014.

-14-

31.     **The pre-petition wages component of the Pre-Petition Compensation that is payable on February 28, 2014 will be approximately $83,311.20.[5]** The payroll for the Employees is paid in arrears on a bi-monthly basis.

32.     **This Pre-Petition Compensation amounts include compensation to the four (4) insiders in this case, but <u>no</u> payments will be made to the insiders until such time as the Debtor's post-petition compensation is authorized to be paid pursuant to the U.S. Trustee Guidelines.** Furthermore, the payroll checks the Debtor seeks authority to pay will not exceed $12,475.

33.     The Debtor also seeks an order authorizing the Debtor to:  (i) retain its pre-petition payroll account(s) for a period of thirty (30) days and directing the bank or other financial institution not or otherwise impair the Debtor's ability to deposit funds into and to withdraw funds from said account(s), and (ii) take all actions reasonable and necessary to comply with its obligations to its existing payroll service, Time & Pay, Inc. ("Time & Pay").  The Debtor further requests that the Court enter an order (i) directing all banks to honor the Debtor's pre-petition checks for payment of any of the foregoing, and (ii) prohibiting all banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.  The payroll accounts serve a very limited purpose, and, thus, the Debtor desires to retain these accounts during the case for thirty (30) days after the Petition Date.  Because these are limited purpose accounts, I do not believe that the retention of these accounts for this limited period of time will have any adverse impact upon the interests of creditors, since no pre-petition claims will be paid from these accounts except to the extent authorized by this Court.

34.     The Debtor's business is dependent upon its labor.  If its employees are not paid, they will cease working and seek employment elsewhere.  I believe that any such disruption would have a devastating effect upon the Debtor's business and consequential value to the creditors.  In contrast, I believe that, if the Court authorized the Debtor to pay its employees, the

---

[5] This number is based on the prior period's actual payroll, which the Debtor believes will approximate the current period payroll.

MAINDOCS-#196900-v2-PrimeChoice_GomezDecReFirstDayMtns

1    Debtor's business operation will continue in the ordinary course, customer needs will be met, and

2    the overall value of the Debtor's business enterprise will be preserved for creditors.

3         35.    As set forth above, I believe that the maximization of the value of the Debtor is

4    contingent upon the continued operation of the Debtor's business.  In this regard, I further believe

5    that the loss of any employee at this critical juncture could materially damage the Debtor's

6    business operations, and, consequently, the value of its overall business enterprise. Along the

7    same lines, I believe that a loss of employee morale and goodwill at this crucial juncture would

8    undermine the Debtor's stability, and undoubtedly would have a negative effect on the Debtor, its

9    customers, the value of its assets and business, and its ability to achieve its objectives in Chapter

10   11.

11        36.    I believe that, unless the Court allows the payments requested herein to its

12   employees, the disruption to the Debtor's employees and business practices would substantially

13   jeopardize the Debtor's ability to reorganize its affairs.

14        37.    I am informed by the Debtor's proposed general insolvency counsel and believe

15   thereon that all of the subject pre-petition wages, as well as claims for vacation and sick leave

16   benefits and other related benefits, constitute priority claims pursuant to the Bankruptcy Code,

17   which will be paid by the Debtor's estate in any event.  The Debtor is unable to determine

18   whether all vacation, severance and sick leave pay was earned by employees within 180 days of

19   the Petition Date or whether contributions to employee benefit plans arise from services rendered

20   within 180 days of the Petition Date; however, none of the payroll checks will exceed this limit.

21   **<u>Debtor's Motion Regarding Utility Providers.</u>**

22        38.    In the ordinary course of business, the Debtor uses gas, water, electric,

23   telecommunications and other services provided by various utility companies (collectively, the

24   "Utility Providers").  The continued and uninterrupted provision of utility services is essential to

25   the Debtor's ability to sustain its operations during its Chapter 11 case.  Any interruption of utility

26   services would severely disrupt the Debtor's business operations.  Prior to the Petition Date, the

27   Debtor generally paid the Utility Providers' bills consistently and on a regular basis. A non-

28   exhaustive list of the Utility Providers that provide utility services to the Debtor as of the Petition

1    Date is attached as Exhibit "2" hereto and incorporated herein by this reference.[6]  The Debtor

2    estimates that its average monthly payments to its Utility Providers is approximately $34,000.

3        39.    To provide adequate assurance of payment for future services to their Utility

4    Providers, the Debtor proposes. to establish reasonable procedures (the "Procedures") by which

5    Utility Providers may request adequate assurance of future payment.  Such Procedures would

6    provide that:

7        •    absent further order of this Court and except as otherwise provided herein,

8    the Utility Providers may not alter, refuse or discontinue service to, or discriminate against,

9    the Debtor on account of the commencement of this chapter 11 case or any unpaid pre-

10    petition charges, or request payment of a deposit or receipt of other security in connection

11    with any unpaid pre-petition charges;

12        •    the Debtor will serve the Motion and an order granting the Motion on an

13    interim basis, if granted by the Court, via first-class mail, within three (3) business days

14    after the date that the order is entered by the Court, on all Utility Providers identified on

15    Exhibit "2" attached hereto; provided that for any Utility Provider that may have been

16    omitted from Exhibit "2" hereto, the Debtor shall have the right to supplement such list of

17    Utility Providers and shall promptly provide notice of the order upon learning of such

18    Utility Provider;

19        •    a Utility Provider may request assurance of payment within thirty (30) days

20    after the Petition Date (an "Assurance Request") by submitting an Assurance Request to (i)

21    Winthrop Couchot, P.C., 660 Newport Center Drive, Suite 400, Newport Beach, California

22    92660, Attn: P.J. Marksbury; and (ii) Prime Choice Foods, Inc., 155 North Lake Avenue,

23    Suite 816, Pasadena, California 91101, Attn:  José G. Gomez;

24        •    any Assurance Request must (i) be made in writing; (ii) specify the amount

25    and nature of assurance of payment that would be satisfactory to the Utility Provider;

26

27    [6]  Neither the omission from nor inclusion in Exhibit "2" hereto is dispositive as to whether a particular party is or is
not a utility company, but simply represents the Debtor's attempt to be conservative and inclusive as to the status of

28    such party.  The Debtor reserve all rights to further address the characterization of any particular entities listed on
Exhibit "2" hereto as a utility company under the Bankruptcy Code.  The relief requested is with respect to all Utility
Providers and is not limited to only those identified in Exhibit "2" hereto.

MAINDOCS-#196900-v2-PrimeChoice_GomezDecReFirstDayMtns

(iii) set forth location(s) for which utility services are provided and the relevant account number(s); (iv) describe any deposits, prepayments or other security currently held by the requesting Utility Provider; (v) explain why the requesting Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance as future payment; and (vi) include a summary of the Debtor's payment history relevant to the affected account(s);

- if a Utility Provider makes a timely Assurance Request that the Debtor believes is reasonable, then the Debtor shall be authorized in its sole discretion to comply with such request without further order of the Court;

- if the Debtor believes the Assurance Request is unreasonable, the Utility Provider may schedule a hearing to determine if additional assurance to such Utility Provider is necessary (the "Determination Hearing");

- pending resolution of that issue at any such Determination Hearing, any Utility Provider making an Assurance Request shall be prohibited from altering, refusing or discontinuing service to the Debtor; and

- a Utility Provider shall be deemed to have adequate assurance of payment unless and until a future order of this Court is entered requiring further adequate assurance of payment.

40. I believe that the list of Utility Providers attached as Exhibit "2" hereto is a complete list; however, the Debtor reserves the right, without further order of the Court, to supplement the list if any Utility Provider has been inadvertently omitted. If the Debtor supplements the list subsequent to the filing of this Motion, the Debtor will promptly serve a copy of the motion regarding Utilities, and the signed Order, on any Utility Provider that is added to the list by such a supplement. Concurrently with such service, the Debtor will file with the Court a supplement to Exhibit "2" hereto adding the name of the Utility Provider so served. Such an added Utility Provider shall have thirty (30) days from the date of service of this Motion and the order to make an Assurance Request. If such an Assurance Request is made, the Debtor shall abide by the procedures set forth above, as applicable. Pending resolution of any Determination

1   Hearing relating to an Assurance Request, the Debtor may seek an order prohibiting any such

2   Utility Provider from altering, refusing or discontinuing utility services to the Debtor.

3         41.    The Debtor proposes to protect the Utility Providers further by establishing the

4   Procedures provided for herein, whereby any Utility Provider can request adequate assurance in

5   the event that it believes there are facts and circumstances with respect to its providing post-

6   petition services to the Debtor that would merit greater protection.

7         42.    The Debtor cannot continue to perform without continued utility services.  If any

8   of the Utility Providers alter, refuse or discontinue service, even for a brief period, the Debtor's

9   business operations would be severely disrupted.  Any such disruption could have a devastating

10  impact on the Debtor's going concern value.  I believe it is critical that utility services continue

11  uninterrupted.

12        43.    The Debtor has an aggregate of approximately 214 creditors.  I believe that

13  requiring the Debtor to serve all of the creditors with notice of all proceedings in this case and to

14  respond to the related inquiries arising therefrom would be administratively burdensome and

15  unduly expensive.  Accordingly, I believe that a Court order lessening the Debtor's notice

16  requirements would substantially reduce the Debtor's postage and reproduction costs, as well as

17  attorney's fees, from the outset of these bankruptcy proceedings, thereby facilitating significantly

18  the economical and efficient administration of the Debtor's case.

19        44.    I believe that limiting notice to the U.S. Trustee, the unsecured creditors holding

20  the twenty (20) largest claims, or, if a committee of unsecured creditors is formed, to the

21  committee or to any counsel employed by the committee; secured creditors and their counsel, and

22  to all parties who request special notice in the Debtor's Chapter 11 case would provide adequate

23  and proper notice to affected creditors and to other interested parties.  Additionally, the Debtor

24  will provide notice to any party whose interest is impacted directly by a particular action or

25  proceeding that the Debtor files.

26        45.    Notwithstanding the Debtor's proposed procedures for limiting notice in the

27  Debtor's case, the Debtor will provide to all creditors notice of the following matters:

28

MAINDOCS-#196900-v2-PrimeChoice_GomezDecReFirstDayMtns

1        a.      The time fixed for filing objections to, and the hearing to consider approval

2    of, a disclosure statement;

3        b.      The time fixed for filing objections to, and the hearing to consider

4    confirmation of, a plan;

5        c.      Any time fixed for filing objections to, and any hearing to consider, a

6    proposed sale of all or substantially all assets of the estate;

7        d.      Notices with respect to claims bar dates; and

8        e.      Any time fixed for filing objections to, and any hearing on, a dismissal of

9    the case.

10   46.     I believe that adoption of this proposed notice procedure is necessary and

11   appropriate, as the proposed procedure will relieve the Debtor of the significant administrative

12   burdens that would be associated with periodic "mass mailings," and would reduce substantially

13   the Debtor's postage and reproduction costs, as well as the time spent by attorneys and/or

14   paralegals, thereby facilitating significantly the economical and efficient administration of the

15   Debtor's case.

16   47.     As of the filing of the Motions, no trustee, examiner or Committee has been

17   appointed in the Debtor's Chapter 11 case. I have directed the Debtor's proposed general

18   insolvency counsel to provide notice of the Cash Collateral Motion via e-mail or overnight

19   mail to the U.S. Trustee, to the creditors asserting secured claims against the estate or to

20   their counsel, and to the Debtor's twenty largest general unsecured, non-insider creditors.

21   I declare under penalty of perjury that the foregoing is true and correct.

22   Executed on this 25th day of February 2014, at Pasadena, California.

23

24

25   José G. Gomez

26

27

28

-20-

# EXHIBIT "1"

**PRIME CHOICE FOODS, INC.**
Projected Cash Flow
13 Weeks Ended April 18, 2014

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash** | 210,000 | 107,713 | 88,109 | 46,380 | 76,776 | 6,417 | 7,162 | 116,752 | 256,936 | 122,902 | 263,216 | 216,828 | 380,216 | 210,000 |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Collection on receivables | 78,026 | 143,114 | 171,737 | 171,737 | 204,936 | 298,226 | 339,871 | 309,871 | 186,000 | 310,000 | 372,000 | 310,000 | 267,838 | 3,163,356 |
| DIP Financing | | | | | | | | | | | | | | 0 |
| **Total Receipts** | 78,026 | 143,114 | 171,737 | 171,737 | 204,936 | 298,226 | 339,871 | 309,871 | 186,000 | 310,000 | 372,000 | 310,000 | 267,838 | 3,163,356 |
| **Disbursements** | | | | | | | | | | | | | | |
| Cost of Raw Materials | 88,931 | 88,931 | 80,248 | 133,747 | 160,496 | 160,496 | 96,342 | 160,570 | 192,684 | 160,570 | 138,735 | 138,735 | 138,735 | 1,739,219 |
| Payroll Plus Taxes and Benefits | 86,333 | | 93,662 | | 93,230 | | 93,470 | | 93,929 | | 93,800 | | 94,419 | 648,843 |
| Rent | | 22,882 | | | | 22,882 | | | | | 22,882 | | | 68,647 |
| Utilities | | | | | 12,457 | | | | | 22,481 | | | 26,989 | 61,927 |
| Freight Out | 5,049 | 5,049 | 4,556 | 7,594 | 9,113 | 9,113 | 5,470 | 9,117 | 10,940 | 9,117 | 7,877 | 7,877 | 7,877 | 98,748 |
| Nitrogen, Argon & Oxigen Gas | | 6,660 | | | | 12,020 | | | | | 14,430 | | | 33,110 |
| Repairs & Maintenance and Supplies | | 4,248 | | | 7,666 | | | | | 9,204 | | | | 21,118 |
| Product Development & Quality Control Supplies | | 2,772 | | | 5,003 | | | | | 6,007 | | | | 13,782 |
| Plant Supplies & Certifications and Audits | | 3,077 | | | 5,553 | | | | | 6,666 | | | | 15,296 |
| Fuel Expense | | 854 | | | 1,541 | | | | | 1,850 | | | | 4,245 |
| Sewer Surcharge,Sludge & Trash Removal | | 2,296 | | | 4,144 | | | | | 4,975 | | | | 11,415 |
| Other Indirect Overhead | | 2,472 | | | 4,400 | | | | | 5,267 | | | | 12,138 |
| Other Distribution & Delivery Expenses | | 3,386 | | | 6,112 | | | | | 7,337 | | | | 16,835 |
| Sales Expenses | | 2,775 | | | 3,000 | | | | | 5,325 | | | | 11,100 |
| Travel & Lodging, Meals & Entertainment | | 2,647 | | | 4,778 | | | | | 5,736 | | | | 13,161 |
| FedX & UPS, Postage & Phone | | 2,720 | | | 4,909 | | | | | 5,894 | | | | 13,523 |
| Insurance/Business Policy | | 1,335 | | | 2,409 | | | | | 2,893 | | | | 6,637 |
| IT Services -Web Site Develop & Maintenance | | 3,870 | | | 9,506 | | | | | 9,567 | | | | 22,943 |
| General and Administrative | | 6,743 | | | 8,950 | | | | | 9,943 | | | | 25,637 |
| Interest Expense | | 0 | | | 15,000 | | | | | 15,000 | | | | 30,000 |
| | | | | | | | | | | | | | | |
| Chapter 11 | | | | | | | | | | | | | | |
| *Adequate protection pmts* | | | | | | | | | | | | | | |
| Security Deposits | | | | | | | | | | | | | | |
| U.S. Trustee Fees | | | | | | 10,000 | | | | | 10,000 | | | 20,000 |
| Committee Professional Fees | | | | | | | | | | | | | | 0 |
| Debtor's Professional Fees - Attorneys | | 35,000 | | | | 35,000 | | | | | 35,000 | | | 105,000 |
| Debtor's Professional Fees - Accounting | | | | | | | | | | | | | | 0 |
| **Total Disbursements** | 180,313 | 162,718 | 213,466 | 141,340 | 275,295 | 297,481 | 230,282 | 169,687 | 320,034 | 169,687 | 418,388 | 146,612 | 268,020 | 2,993,323 |
| **Ending Cash** | 107,713 | 88,109 | 46,380 | 76,776 | 6,417 | 7,162 | 116,752 | 256,936 | 122,902 | 263,216 | 216,828 | 380,216 | 380,034 | 380,034 |

| **Value of Collateral** | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Cash Collateral* | | | | | | | | | | | | | | |
| Cash | 107,713 | 88,109 | 46,380 | 76,776 | 6,417 | 7,162 | 116,752 | 256,936 | 122,902 | 263,216 | 216,828 | 380,216 | 380,034 | |
| A/R (5) | 171,737 | 204,936 | 298,226 | 339,871 | 309,871 | 186,000 | 310,000 | 372,000 | 310,000 | 267,838 | 267,838 | 267,838 | 267,838 | |
| Inventory | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | |
| Sub-total | 929,450 | 943,045 | 994,606 | 1,066,648 | 966,289 | 843,162 | 1,076,752 | 1,278,936 | 1,082,902 | 1,181,054 | 1,134,666 | 1,298,054 | 1,297,872 | |
| *Other Collateral* | | | | | | | | | | | | | | |
| Property Newton Rd. Bristol, VA | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | |
| Property Thomas Rd, VA | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | |
| Equipment at Newton Rd. | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | |
| Sub-total | 4,300,000 | 4,300,000 | 4,300,000 | 4,300,000 | 4,300,000 | 4,300,000 | 4,300,000 | 4,300,000 | 4,300,000 | 4,300,000 | 4,300,000 | 4,300,000 | 4,300,000 | |
| **Total** | 5,229,450 | 5,243,045 | 5,294,606 | 5,366,648 | 5,266,289 | 5,143,162 | 5,376,752 | 5,578,936 | 5,382,902 | 5,481,054 | 5,434,666 | 5,598,054 | 5,597,872 | |

| **Loan Balance** | 4,642,027 | 4,642,027 | 4,642,027 | 4,642,027 | 4,642,027 | 4,642,027 | 4,642,027 | 4,642,027 | 4,642,027 | 4,642,027 | 4,642,027 | 4,642,027 | 4,642,027 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| **Equity Cushion** | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Amount | 587,423 | 601,018 | 652,579 | 724,621 | 624,262 | 501,135 | 734,725 | 936,909 | 740,875 | 839,027 | 792,639 | 956,027 | 955,845 | |
| % | 13% | 13% | 14% | 16% | 13% | 11% | 16% | 20% | 16% | 18% | 17% | 21% | 21% | |

**NOTES:**
(1). This based on existing backlog from invoices issued which are collected in 30 days
(2). Based on Sales forecast
(3). Based on existing payroll
(4). All other expenses are based on historical results
(5). Based on invoices from day goods are shipped

# EXHIBIT "2"

# Exhibit "2"

## Utility Provider

BVU Optinet-WHSE
BVU Optinet-Newton

Bristol Virginia Utilities-XXXXXX-XX0153
Bristol Virginia Utilities-XXXXXX-XX0154
Bristol Virginia Utilities-XXXXXX-XX0155
Bristol Virginia Utilities-XXXXXX-XX0319
Bristol Virginia Utilities-XXXXXX-XX0320
Bristol Virginia Utilities-XXXXXX-XX5832

Atmos Energy-XXXX421-8 (XXXXXX2220)
Atmos Energy-XXXX282-6 (XXXXXX2426)
Atmos Energy-XXXX495-7 (XXXXXX2855)
Atmos Energy-XXXXXX2668

Stand Energy

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  660 Newport Center Drive, 4th Floor, Newport Beach, CA 92660.

A true and correct copy of the foregoing document entitled:  **DECLARATION OF JOSÉ G. GOMEZ IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS RE:  (1)  CASH COLLATERAL; (2)  PAYROLL; (3)  UTILITIES; AND (4)  LIMIT NOTICE** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On February 25, 2014, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On _____, 2014, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on February 25, 2014, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Via Attorney Service**
Honorable Robert Kwan
Roybal Federal Building
255 E. Temple St.
Los Angeles, CA 90012-3332

Debtor:  jgomez@primechoicefoods.com

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 25, 2014 | Viann Corbin | /s/ Viann Corbin |
|---|---|---|
| Date | Printed Name | Signature |

MAINDOCS-#196900-v2-PrimeChoice_GomezDecReFirstDayMtns

NEF SERVICE LIST

- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Marc J Winthrop    mwinthrop@winthropcouchot.com,
  pj@winthropcouchot.com;vcorbin@winthropcouchot.com

MAINDOCS-#196900-v2-PrimeChoice_GomezDecReFirstDayMtns